## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

### *Electronically Filed*

| | | |
|---|---|---|
| **TAPHORN, MEGAN** | ) | |
| **10520 CAROLINA TRACE RD.** | ) | |
| **HARRISON, OH 45030** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **CASE NO. _____** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TRIHEALTH INC.** | ) | **WITH JURY DEMAND** |
| **625 EDEN PARK DR.** | ) | |
| **CINCINNATI, OH 45202** | ) | |
| **Serve:** | ) | |
| **FILE JET INC.** | ) | |
| **C/O ANDREW WHITE** | ) | |
| **1201 DUBLIN RD. #609** | ) | |
| **COLUMBUS, OH 43215** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

## COMPLAINT

For her complaint against TriHealth Inc. Plaintiff Megan Taphorn alleges and avers as follows:

1.      Throughout the Covid-19 pandemic, the Plaintiff, Megan Taphorn stood ready, willing, and able to take safety precautions in the workplace as required by her past employer to prevent the spread of Covid-19 and protect her health the health her co-workers and patients she served. The Plaintiff, however, has a religious belief that conflicts with one of her past employer's safety policies: mandatory vaccination.  The Plaintiff's conflict is protected by federal and state law. This case is a challenge to the lawfulness of the policy imposed by the

1

Defendant, the implication of said policy, as well as an attempt to prevent unlawful discrimination based on religion and disabilities in the future and to hold her past employer accountable for the harm they suffered at its hands.

2.      Federal and state law recognize an employee has a right to have religious beliefs considered when those beliefs conflict with an employer's policies, and, when possible, accommodated. The Defendant ignored federal and state law and instead applied its own set of rules when it came to evaluating religious accommodations and exemptions to its mandatory Covid-19 vaccination. Defendant wrongfully denied Plaintiff's request by claiming that Ms. Taphorn was required to submit her religious exemption request while she was not working in preparation for giving birth.

3.      Ms. Taphorn was informed via email on December 7, 2021 that "Your request for a COVID-19 Vaccine declination has been denied. Your submission was received after the deadline to submit the forms for review, 9/17/21" (attached here to as **Exhibit A)** This was done in violation of Defendant's obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and Section 4112.02 of the Ohio Revised Code.

4.      Upon information and belief, Ms. Taphorn' religious exemption was never evaluated under required legal guidelines because of the Defendant's demand for her to submit the declination form by September 17, 2021 was not met.

5.      Ms. Taphorn was not a full-time employee of the Defendant. Ms. Taphorn would work with her managers, usually on a weekly basis, to determine how many hours she would work for the week.

6.     Ms. Taphorn's last day of work was Monday September 13, 2021 as she had no hours scheduled for her to work between 9/13/21 and the beginning of her official medical leave which began on October 1, 2021 and ran through January 3, 2022.

7.     Ms. Taphorn had no hours scheduled after September 13, 2021 because of all the strict requirements she had to adhere to so that she could have family physically present at the birth of her child during the turbulent times of the Covid-19 pandemic.

8.     Ms. Taphorn had to coordinate Covid-19 tests for family members, as well as herself, to try to make the process of child delivery go as smooth as possible.

9.     On the day of September 17, 2021 Ms. Taphorn was not at work, had no hours scheduled, and would not be back to work until January 3, 2022.

10.     On October 28, 2021, while Ms. Taphorn was out on medical leave, she received a letter from Defendant that stated "**ALL** Trihealth employees must have COVID vaccination or approved declination before returning to work from a leave of Absence. Team members on Leave of Absence, must confirm at least one vaccine dose upon Return to Work, and the second dose <u>within 30 days of returning to work</u>. **You can submit your COVID vaccination confirmation to [covidvaccination@trihealth.com](mailto:covidvaccination@trihealth.com)** (emphasis in original) (attached hereto as **Exhibit B**)

11.     The letter additionally states that if a person wishes to request a religious exemption to the Covid-19 vaccine, then the person "<u>must submit declination prior to Return to Work.</u>" (emphasis in original) *See* **Id**.

12.     Ms. Taphorn abided by the rules provided in the October 28th letter. She included both a flu vaccine and Covid-19 vaccine exemption requests.

13.     Ms. Taphorn's flu exemption was granted, her Covid-19 vaccine exemption was denied. Both of them were turned-in past the due dates as described by Defendant.

14.     The "Religious Declination For Flu Vaccination" was completed and provided to Defendant on or about December 2, 2021. However, as the form states, it was due on 10/29/21. (attached hereto as **Exhibit C**)

15.     The "Religious Declination for COVID-19 Vaccination" was completed and provided to Defendant on or about December 2, 2021. The form does not have a due date. (attached hereto as **Exhibit D**)

16.     The 12/7/21 email that informs Ms. Taphorn of the denial of her Covid-19 exemption request also states that her flu exemption request was granted. *See* **Exhibit A**

17.     Defendant's actions left Ms. Taphorn with the impossible choice of either taking the Covid-19 vaccine, at the expense of her religious beliefs, or losing her livelihood.

18.     Under Title VII and Ohio law, an employer must provide a legitimate opportunity to seek religious accommodations. The employer cannot summarily impose employer-preferred workplace rules that abridge an employee's federally protected rights without genuine, good-faith dialogue and consideration of proposed accommodations with objective evidence, and, if the employer chooses to deny an employee accommodation request, proof that allowing the accommodation would place an undue burden on the employer. The conduct of TriHealth was in violation of these laws.

## PARTIES

19.     The Plaintiff, Megan Taphorn, is a resident of Harrison, Ohio. The Plaintiff had been employed by the Defendant for over 10 years. The Plaintiff has a sincere religious

belief that taking a Covid-19 vaccine violates her religious beliefs. The Plaintiff requested a

religious accommodation from the Defendant's vaccine mandate policy.

20.     The Defendant is incorporated in the State of Ohio, with its principal

place of business at 625 Eden Park Dr. Cincinnati, OH 45202.  Actual direction, control and

coordination of the Defendant's business occurs in Cincinnati, Ohio.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331

because the Complaint seeks relief and damages under federal statute, 42 U.S.C. § 2000e, *et seq.,*

and has supplemental jurisdiction over the Plaintiff's state law claim arising from the same

events and occurrences under O.R.C. § 4112.02 pursuant to 42 U.S.C. § 1367.

22.     Venue is proper in this district pursuant to U.S.C. § 1391(b) because

the relevant events took place in Cincinnati, Ohio, which is in the Southern District of Ohio and

the Defendant's principal place of business is located therein.

23.     The Court has personal jurisdiction over the Defendant because the

Defendant resides and conducts business in this judicial circuit.

24.     Plaintiff's claims for attorney's fees and costs are predicated upon Title

VII, 42 U.S.C. § 2000e-5, and as allowed under state law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

25.      On or about January 19, 2021, Plaintiff timely filed charges of religious

discrimination with the Ohio Civil Rights Commission which has a dual filing agreement with

the Equal Employment Opportunity Commission.

26.     Her Notice of Right to Sue was issued on September 14, 2022. (attached hereto as **Exhibit E**).

27.     This Complaint is being timely filed based on the date Plaintiff received her Notice of her Right to Sue.

28.     All administrative prerequisites to the filing of this suit have been meet.

## ALLEGATIONS

29.     In March 2020, American life was irreparably changed both by Covid-19 and by various governments and employers' response to it. Covid-19 is a virus that was first detected in Wuhan, China, and eventually made its way to the United States of America, setting off a chain of events that has irretrievably changed the day-to-day life of many, if not most, Americans.

30.     In the spring of 2020, the Defendant began implementing procedures for its workforce, including several of the following requirements for its employees: masks, social distancing, temperature checks, COVID-19 testing, and self-quarantine. Upon information and belief, the Defendant had substantial success reducing the risk of Covid-19 spread through these efforts.

31.     Despite the Defendant's success in controlling the spread of Covid-19 in its workspace, the Defendant chose to implement a blanket vaccine mandate, based on reasoning unsupported by science, and has improperly implemented its vaccine mandates in violation of Title VII and O.R.C. § 4112.02.

32.     Furthermore, the Defendant improperly terminated the Plaintiff for

refusing to comply with one of its safety procedures – mandated vaccination – which has no documented positive results in preventing the transmission of Covid-19 in the workplace, ignores natural immunity, and improperly asses risk.

33.    Defendant's vaccine policy included a deadline for submission of September 17, 2021. The Defendant's strict adherence to this deadline precluded Ms. Taphorn's Covid-19 vaccination exemption request from being properly considered.

34.    Ms. Taphorn was not working for most of the entire week of September 17, 2021 and did not work regular hours with Trihealth. She was not in the meetings that discussed Covid vaccination like that of a regular employee.

35.    On the date of Sept. 17, she was at home making final preparations to give birth.

36.    Defendant's own actions in granting a flu exemption based on religious grounds, that was also late according to the Defendant's policy, shows that the Defendant was not treating people with religious conflicts to the Covid-19 vaccine legally consistent.

37.    Ms. Taphorn did meet the submission deadline for a religious exemption provided to her on October 28, 2021.

38.    Ms. Taphorn sent numerous e-mails, text messages, and phone calls to her managers and co-workers to try to understand how she can be provided two separate deadline dates, adhering to one, but missing the other because she was not working at the time, which resulted in her termination.

39.    The responses to her emails and texts show a number of very important aspects of the Defendant's process. One, there was no ability to appeal the denial and two, if she did not get vaccinated, she would be terminated. This was memorialized by a December, 8, 2021, Antoinette Thomas email that stated "there is no true process to appeal the decision they

[review committee] have made. If they stick with the denial, you will be terminated from your position." (attached hereto as **Exhibit F**)

40.     Ms. Thomas also called Ms. Taphorn on December 14, 2021 and left a message that again reiterated Defendant's position when she stated that she spoke with their HR partner who stated "there's nothing else that they can do as far as your exemption. So I did want to let you know that I do have to term [terminate] you um as of the 31st." (emphasis added in attachment) (attached hereto as **Exhibit G**).

41.     At no point during any of the communications with Ms. Taphorn did the Defendant ever suggest they gave any consideration to Ms. Taphorn's Covid-19 vaccine exemption request.

42.     In the document posted at the EEOC website titled: "What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws" (EEOC guidelines) the EEOC provides rules on how a religious exemption to the Covid-19 vaccine should be evaluated.  In Section L.2 it states:

> Generally, under Title VII, an employer should proceed on the assumption that a request for religious accommodation is based on sincerely held religious beliefs, practices, or observances.  However, if an employer **has an objective basis** for questioning either the religious nature or the sincerity of a particular belief, the employer would be justified in making a limited factual inquiry and seeking additional supporting information.[1] (emphasis added).

43.     Ms. Taphorn provided thorough reasoning and a clear unequivocal basis for her accommodation request rooted in her sincerely held religious belief in her declination form which included complete answers to questions 1-4 as well as signing the arguably illegal requirement of Section A of the Defendant's Covid vaccine declination form. *See* **Exhibit D**.

---

[1] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L

The statements provided in this document easily carries the initial burden as required in the EEOC guidelines and discussed further below.

44.     While companies are allowed to have vaccine mandates, they still must adhere to federal and state laws. As in the case here, the Defendant failed to even consider Ms. Taphorn' religious declination.

45.     In an email to Ms. Taphorn dated December 7, 2021, the Defendant made it clear that Ms. Taphorn' religious exemption was never considered. *See* **Exhibit A**

46.     The Plaintiff provided more than enough information to meet her legal obligations to have her religious accommodation granted.

47.     In spite of all the efforts and information provided by Ms. Taphorn, the Defendant wrongfully and improperly denied the Plaintiff's request and terminated her employment in violation of state and federal law.

48.     The clearest statement that proves the Defendant's actions were in violation of Federal Law is the unambiguous statement from the EEOC guidelines from section K.12 where it states:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting a COVID-19 vaccine, the employer **must** provide a reasonable accommodation unless it would pose an undue hardship." (emphasis added)

EEOC guidance explains that the definition of religion is broad and protects:

> beliefs, practices, and observances with which the employer may be unfamiliar. Therefore, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance.

49.     The Defendant failed to meet the above requirements in their decision to require Ms. Taphorn submit her religious exemption when she was not actively working at TriHealth and was preparing for her maternity leave. They did this willfully while trampling the rights

guaranteed under Title VII and specifically documented in the EEOC guidelines that are particular to religious exemptions and the Covid-19 vaccine.

50.     By the Defendant time barring Ms. Taphorn's religious exemption, the Defendant completely failed to address Ms. Taphorn's religious objections to the vaccines and how the vaccines are in direct conflict with her religious beliefs.

51.     Ms. Taphorn's religious beliefs are hers and hers alone and the law requires that those religious beliefs get proper consideration once the Defendant was put on notice. Regardless of whether the Ms. Taphorn met the Defendant's initial deadline, or the deadline she received while on maternity leave, there was no objective basis to believe her sincerely held religious beliefs were insincere nor that they are not religious in nature.  Therefore, Ms. Taphorn' accommodation must be granted unless an undue burden is objectively shown. Such undue burden claim also fails as documented below.

52.     The decision to terminate Ms. Taphorn was done without proper opportunity and consideration of the Plaintiff's rights. Had that been done properly, the Defendant would have then had to consider whether the accommodations would be an undue burden on the Defendant, which is required under Title VII and state law. Defendant failed on both counts.

**The Defendant pivoted from successful and proven Covid-19 mitigation practices and improperly chose mandated vaccination as its sole safety procedure upon which it predicated employment.**

A. The vaccine mandate is unlawful as enforced.

53.     The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020 for select populations. One week later a second EUA for the Moderna COVID-19 vaccine was issued. The FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021. On

10

August 23, 2021, the FDA issued full approval for the Pfizer-BioNTech COVID-19 vaccine marketed as Comirnaty. However, it should be noted, that the FDA has admitted the Comirnaty vaccine, which is legally distinct from the Pfizer vaccine that is currently available in the US, was not available when Ms. Taphorn was terminated.

54.    Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines widely available for use in the United States are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses.

55.    Since the rollout of the vaccines, and prior to Ms. Taphorn's termination, more and more data increasingly showed the vaccines do not prevent infection, do not prevent transmission, and do not prevent illness. Indeed, countries with the most aggressive, expansive use of the vaccines have seen record-setting infection rates and continuing high illness rates.

56.    Scientists studying over 4,000 frontline workers found that between December 2020 until April 2021, the effectiveness of the vaccines cratered from 91 percent to 66 percent. This drastic decline occurred before the Delta and Omicron variants became dominant.[2]

57.    Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020, until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[3]

58.    In addition, governmental authorities have revised their definition of the

---

[2] Ashely Fowlkes, et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020-August 2021,* 70 Morbidity and Mortality Weekly Report (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.com.

[3] Sara Y. Tartof, et al., *Six-month Effectiveness of BNT162b2mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohost Study,* Lancet, 2021 Oct. 16, 398 (10309):1407-16, available at https://pubmed.ncbi.nlm.nih.gov/34619098/.

word "vaccine" itself to continue to label these experimental drugs with novel ingredients "vaccines" because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission. None of which these vaccines can any longer claim credit for such results which reflects the fact there has never been a successful COVID-19 vaccine in history due to the viral evolution.[4]

B.  The vaccine mandate ignores natural immunity.

59.      The National Institutes of Health and other bodies have found that natural immunity to Covid-19 – that is, immunity cause by infection with Covid-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the Covid-19 virus remain in 98% of people who have recovered from the virus six to eight months after infection (the outer limit of the study was simply because the study was done on individuals where were six to eight months out of recovery, not because immunity begins to wear off).[5]

60.      Health and Human Services' Assistant Secretary, Dr. Admiral Brett Giroir stated in August 2021, in a nationally televised interview, that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective." [6]

61.      The data out of the State of Israel underscores this point. In a paper awaiting peer review, scientists out the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer

---

[4] Katie Carrero, *Why did the CDC change its definition for 'vaccine'? Agency explains more as skeptics lurk,* MIAMI HERALD (Sept. 27, 2021) available at https://wwww.miamiherald.com/news/coronavirus/artcle254111268.html.

[5] NIH, *Lasting immunity found after recovery from COVID-19*, NIH (Jan. 26, 2021), available at https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19.

[6] FOX NEWS, *Admiral Brett Giroir explains natural immunity to COVID-19*, Admiral Brett Giroir (Aug. 13, 2021) available at https://www.youtube.com/watch?v=O641EW4okPs.

vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of Covid-19 over those whose immunity was natural.[7]

62.    Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated. Israel's bout with the Delta variant of Covid-19 has demonstrated that the Pfizer vaccine, once considered the Cadillac of the three Covid-19 vaccines, is only 64% effective at preventing symptomatic cases of Covid-19.[8] Moreover, despite Israel's high vaccination rates, Israel is becoming "the world's COVID hotspot."[9]

63.    In addition, in a study concerning the Omicron variant, scientists found that the variant "can evade immunity from Covid-19 more so than any other previous variants discovered during the course of the pandemic."[10] "Researchers studied over 11,000 Danish households and found that those who had the Omicron variant had a 31 percent chance of a secondary attack rate (SAR), which refers to the probability an infection occurs within a specific group like a household or close contacts."[11] Moreover, the study revealed that "vaccine effectiveness was reduced to around 40 percent against symptoms and to 80 percent against severe disease. . ."[12]

---

[7] Sivan Gazit, et al., *Comparing SARS-CoV-2 Natural Immunity to Vaccine -Induced Immunity: Reinfections Versus Breakthrough Infections*, medRvix (Aug. 25, 2021), available at https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf.

[8] Aaron Blake, *Vaccine doubters' strange fixation with Israel*, WASHINGTON POST (Jul. 22, 2021) available at https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reasons/.

[9] Conor Boyd, *Israel is not the world's Covid hot spot: Cases sours despite country's trail blazing vaccine roll-out – sparking fears other highly-vaccinated countries will be hit by another wave due to jabs' waning immunity*, DAILY MAIL (Sept. 3, 2021) available at https://dailymail.co.uk/news/article-9951117/Isreal-worlds-covid-hotspot-0-2-population-catching-yesterday.html.

[10] Shirin Ali, New study finds omicron variant better at evading immunity, THE HILL (Jan. 3, 2021) available at https://thehill.com/changing-america/well-being/prevention-cures/588040-new-study-finds-omicron-variant-better-at citing and referencing https://www.medrxiv.org/content/10.1101/2021.12.27.21268278v1.

[11] *Id.*

[12] *Id.*

64.     The now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (re-infection after either contracting Covid-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections. [13]

65.     Another published study found that there is "no discernible relationship between percentage of population fully vaccinated and new COVID-19 cases in the last [seven] days."[14] The study found to the contrary that there was a "marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per [one] million people." [15] That study, which analyzed 68 different countries' vaccination rates and the rate of new Covid-19 cases, specifically referred to Israel, Portugal and Iceland, each of which is highly vaccinated, and which had more cases per one million people than, for example, Vietnam and South Africa, which had around ten percent of their population fully vaccinated.[16]

66.     Several scholarly journals have also weighed in on the superiority of

---

[13]Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccine in Previously Infected Individuals*, medRxiv (Jun. 19, 2021), available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.

[14] S.V. Subramanian and Aknil Kumar, Increases in COVID-19 are Unrelated to Levels of Vaccination Across 68 Countries and 2947 Counties in the United States, Eur J Epidemiol 2021 Sep 30:1-4, https://doi.org/10.1007/s10654-021-00808-7.

[15] *Id.*

[16] *See id.*

natural immunity to vaccine immunity.[17] Further, those who previously were infected with Covid-19 were at greater risk for bad side effects associated with the vaccine - in such cases, the vaccine might even weaken their pre-existing immunity.[18]

67.     While the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of Covid-19, and, therefore, transmission of Covid-19.

C.     The vaccine mandate relies on an improper assumption about the infection-fatality rate and asymptomatic spread.

68.     Covid-19 presents a risk primarily to individuals aged 85 or older[19] and those with comorbidities such as hypertension and diabetes.[20]

69.     The majority of deaths associated with Covid-19 occur in those over the age of 55.[21] Within the most heavily impacted age group (age 85 and up), only 13.3% of deaths from February 2020 to February 2021 were attributed to Covid-19.[22]

70.     One of the most useful measures for calculating the risk of dying from a virus is the infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of Covid-19

---

[17]Jackson S. Turner, et al., *SARS-CoV-2 Infection Indicates Long-lived Bone Marrow Plasma Cells in Humans*, Nature, 595, 421-25 (May 24, 2021), available at https://www.nature.com/articles/s41586-021-03647-4.
[18] Carmen Camara, et al., *Differential Effects of the Second SARS-CoV-2 mRNA Vaccine Dose on T Cell Immunity in Naïve and COVID-19 Recovered Individuals*, bioRxiv (Mar. 22, 2021) https://doi.org/10.1101/2021.03.22.436441, available at https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1.
[19] Mayo Clinic, *COVID-19: who's at higher risk of serious symptoms* (Jan. 22, 2022) available at: https://www.mayoclinic.org/diseases-conditions.
[20] Wren Hann, et al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis*, ASM Journals/mBio/Vol.12, No. 1 (Feb.9, 2021) https://doi.org/10.1128/mBio.03647-20, available at  https://journals.asm.org/doi/10.1128/mbio.03647-20?permantly+true&.
[21] *Id.*
[22] Heritage Foundation, *COVID-19 Deaths by age* (Feb. 17, 2021) available at https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/.

deaths by the number of Covid-19 infections. It attempts to answer the critical question: "If I get sick, what is the chance that I will die?" The Center for Disease Control and Prevention ("CDC") estimates the IFR for the bulk of most working-age adults is exceedingly low.[23] For adults under age 50, the CDC's "current-best estimate" is that 500 people will die per 1,000,000 infections nationwide.[24] In other words, for every one million adults infected age 50 or younger, 999,500 of them will survive Covid-19.[25]

71.    Assuming the data regarding Covid-19 infections is accurate, the CDC's numbers show Americans across the board are far more likely to die of something other than Covid-19, which casts considerable doubt on the Defendant's assertions that all employees should be vaccinated due to business necessity.[26]

72.    The Defendant already employed a very successful method of preventing Covid-19 spread from the symptomatic – self-quarantine. The Defendant's vaccine mandate only addresses one risk: asymptomatic lethal spread. The problem with the Defendant's mandate is two-fold: first, asymptomatic lethal spread is significantly less of a threat than the Defendant seems to assert,[27] and second, testing more effectively, and easily, suffices rather than forced

---

[23] CDC, *COVID-19 Pandemic Panning Scenarios,* Centers for Disease Control and Prevention (Mar. 19, 2021) available at https://www.cdc.gov/oronavirus/2019-ncov/hcp/planning-scenerios.html.

[24] *Id.*

[25] *Id.*

[26] Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male,* NATURE (Aug. 28, 2020) (demonstrating that individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car) available at https://www.nature.com/articles/d41586-020-02483-2.

[27] Michael A. Johansson, et al., *SARS-CoV-2 Transmission from People Without COVID-19 Symptoms,* JAMA Netw. Open, 2021; 4(1):e2035057 (Jan. 7, 2021) http://doi.10.1001/Jamanetworkopen.202.35057, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707. *See also* Kenneth

injections of unwanted experimental, potentially life-altering drugs developed in ways that offend the Plaintiff's religious beliefs or discriminates against her because of her sincerely held religious beliefs.

73.     The Defendant uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit Covid-19 to others without having any symptoms of Covid-19 – to justify its vaccine mandate. But there is little credible scientific evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to employees or anyone else for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. The Defendant's response to Covid-19 is predicated, in part, on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading disease.

74.      Evidence of transmission requires that an individual can be shown to be the source of infection for another person who then developed symptoms of a disease/illness.

75.     Basic microbiology shows that infectiousness or transmission of viruses such as Covid-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[28]

76.     Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the real drivers of viral spread, a fact Dr. Anthony Fauci

---

McIntosh, et al., *COVID-19: Epidemiology, Virology, and Prevention,* WoltersKluner (Jan. 13, 2022) available at https://www.uptodate.com/contents/covid-19-epidemiology-virology-and-prevention#H3392906512.

[28] *See generally*, Samuel Baron, et al., *Medical Microbiology* (4th ed. 1996) available at: https://www.ncbi.nlm.nih.gov/books/NBK8149/. *See also* Hitoshi Kawasuji, et al., *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243597.

initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-born viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver is always a symptomatic person."[29]

77.     When the viral replication process is blocked by a healthy immune system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defenses effectively ward off Covid-19 before it can take hold and cause symptomatic disease. Research demonstrated that asymptomatic people are not the drivers of Covid-19 transmission as demonstrated in the following points.

78.     Researchers studying real-world laboratory samples of more than a quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[30]

79.      A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of Covid-19 occurred from asymptomatic people studied by research in Germany.[31] The researchers note: "The fact that we did not detect any laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple

---

[29] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China*, Press Briefing (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2642s

[30] Andreas Stang, *The performance of the SARS-CoV-2-RT-PCR test as a tool for detecting SARS-CoV-2 infection in the population* (Aug. 2021) 83 J. Infect. 2, https://doi:10.10161j.jinf.2021.05.022  available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8166461/.

[3131] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020,* 27 Emerging Infectious Diseases 4 (April 2021) available at https://www.cdc.gov/cid/article/27/4/20-4576_article.

studies . . ."[32] The lack of scientific and medical evidence surrounding asymptomatic spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially spread COVID-19."[33]

80.     A review in March 2021 of all the published meta-analysis on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed proposition that those who are asymptomatic pose a real danger.[34] In the words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom, "[s]earching for people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[35]

81.     Moreover, according to FDA, there is insufficient data to determine the vaccines authorized for emergency use actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes Covid-19.[36]

82.     Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the

---

[32] *Id.*

[33] *Id.*

[34] *See* John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health advisory & Recovery Team (Mar. 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf.

[35] Allyson M. Pollock, *Asymptomatic transmission of covid-19,* the BMJ (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4851.

[36] FDA, *Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions,* (Nov. 19, 2020) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions.

unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[37]

83.    In sum, little objective evidence exists to support a finding that asymptomatic spread is a driver of Covid-19 and, therefore, poses a danger to the Defendants' workplaces. Rather, the epidemic spread of Covid-19 is propelled almost exclusively by symptomatic persons (many of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

84.    The government-operated Vaccine Adverse Event Reporting System ("VAERS") database is intended to function as an "early warning" system for potential health risks caused by vaccines. Presently, VAERS is broadcasting a red alert, but the Defendants are refusing to take account this important data of adverse reactions to the vaccines and instead is barreling down the tracks of forced vaccination at full steam.

85.    Recent data presents an alarming picture. As of November 18, 2022, there have been 32,370 deaths reported to VAERS from COVID-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines.[38] According to Josh Guetzhow, Ph.D., there are 91 times the number of deaths and 276 times the number of coagulopathy events reported after Covid-19 vaccination than after flu vaccination.[39]

86.    Moreover, research suggests the heightened risk of adverse effects

---

[37] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?",* WASHINGTON POST (Jul. 28, 2021) available at
https://www.washingtonpost.com/health/breakthrough-infections-cdc-data/2021/07/28/dcaaa6b2-efce-11eb-a452-4da5fe48582d_story.html.
[38] Josh Guetshow, *Safety Signals for COVID Vaccines are Loud and Clear. Why is Nobody Listening?* THE DEFENDER (Sept. 29, 2021) available at
https://childrenshealthdefendse.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/.
[39] *Id.*

results from "preexisting immunity to SARS-CoV-2 [that] may trigger intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals

87.     Although the number of VAERS reports is alarming in its own right, it is likely the true number of adverse effects associated with the COVID-19 vaccines far exceeds cases reported to VAERS. In 2010, a federal study commissioned by the U.S. Health and Human Services and performed by Harvard University consultants on behalf of the Agency for Health care Research and Quality ("AHRQ") found that "fewer than 1% of vaccine adverse events" are ever reported to VAERS.[40] Thus, it is likely scores of adverse events associated with the COVID-19 vaccines, including deaths, go unreported.

88.     It is not just VAERS that is broadcasting a red alert. On October 1, 2021, the European Union's drug regulator, the European Medicines Agency ("EMA"), identified a new possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's Covid-19 vaccine.[41] The EMA said the new, possibly life-threatening clotting condition known as venous thromboembolism ("VTE") should be included on the Johnson & Johnson product label as a possible side-effect of the shot.[42]

---

[40] Ross Lazerus, et al. *Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS),* Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov./sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

[41] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharmaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/.

[42] *Id.*

89.     What is more, the Moderna and Pfizer vaccines are made with polyethylene glycol ("PEG") and Johnson & Johnson uses a similarly problematic ingredient: polysorbate.[43] PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery mechanism to the cells that keeps the mRNA from dispersing and not reaching its intended target. PEG performs its intended use. Unfortunately, about 70% of the U.S. population is slightly to somewhat allergic to PEG. The National Institute of Health ("NHI") recently began a clinical trial of "systematic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to the recipients of those vaccines experiencing anaphylaxis.[44]

90.     According to the CDC, individuals who are allergic to PEG should not take the Moderna or Pfizer vaccines, and those who are allergic to polysorbate should not take the Johnson & Johnson vaccine.[45]

91.     Despite this known risk, the Defendant is not offering PEG allergy testing pre-vaccination and are not offering any indemnity or disability coverage from any of the known and potential adverse effects of the COVID-19 vaccines.

92.     To summarize, the potential adverse effects Plaintiff faced in being coerced to receive the Covid-19 vaccines pursuant to the Defendant's vaccine mandate is not theoretical, hypothetical or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the Covid-19 vaccines, subjecting

---

[43] CDC, *COVID-19 Vaccines for People with Allergies* (Dec. 14, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/specific-groups/allergies.html.
[44] NIH, *NIH begins study of allergic reactions to Moderna, Pfizer-BioNTech COVID-19 vaccines* (Apr. 7, 2021) available at https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines.
[45] *See id.* at note 43.

Plaintiff to vaccination exposes them to a variety of health risks ranging from headaches and blood clots to death.

**The Defendant improperly refused to grant the Plaintiff's religious exemption in violation of Title VII and O.R.C. § 4112.12**

A. <u>The Defendant's improper conduct regarding the vaccine mandate policy and procedures and its communications with the Plaintiff regarding her request for a religious exemption.</u>

93. The Defendant terminated Ms. Taphorn with a letter entitled "Voluntary Resignation," dated January 6, 2022 which stated that Trihealth, via their Covid-19 vaccine mandate, was "work[ing] to achieve Zero patient and team member harm." (attached hereto as **Exhibit H**).

94. This document is the epitome of how TriHealth dealt with Ms. Taphorn and the Covid-19 vaccine exemption process. First, Ms. Taphorn did not resign, nor was it voluntary.

95. The Defendant made every single decision as it relates to the end of Ms. Taphorn's employment. Defendant determined the timeline of when Ms. Taphorn would be placed on leave. How long that leave would last. What access to technology she would have during leave and when that access would be revoked. The process by which she could come off leave. When that leave would be redefined as the end of employment, and under what circumstances Ms. Taphorn would eventually be terminated.

96. Ms. Taphorn did not want to end her employment with the Defendant. She merely wanted to have her federally and state protected rights respected and properly applied.

97. Ms. Taphorn never gave her "two weeks" notice of resignation. She never provided any documentation stating her desire to end her employment. She never shared with her

co-workers that she was resigning. Nor was she lining up new employment with the intention of choosing to leave TriHealth and begin employment with another employer.

98.     The Defendant's dishonest manipulation of the end of Ms. Taphorn' employment is despicable, fraudulent, and illegal. The Defendant can call the end of Ms. Taphorn' employment a "Voluntary Resignation" all they want. But the simple exploration of the facts surrounding the situation proves that it was neither voluntary, nor a resignation.

99.     Resignations happen when an employee makes a decision to leave their employer for reasons of their choosing. This is not what happened with Ms. Taphorn.

100.     Defendant's agent, Antoinette Thomas, accidentally spoke the truth in how Ms. Taphorn's employment was to end when he told her via a December 8, 2021 email that if she does not get the vaccine "you will be terminated from your position." *See* **Exhibit F**

101.     Additionally, Ms. Thomas reiterated that position via voice mail where she said that if Ms. Taphorn does not get the vaccine, then "I do have to term you um as of the 31st" *See* **Exhibit G.**

102.     These unequivocal statements by the Defendant's agent provide an honest look into how decisions were being made real-time.

103.     Ms. Taphorn was not making the decisions on whether or not to resign, those were being dictated to her.

104.     In a text thread between herself and Defendant's agent, Director Brandon Bellhaus, Ms. Taphorn stated "I'm not resigning" in response to Bellhaus' claim that the Defendant would accept her voluntary resignation as of 12/31/2021. (attached hereto as **Exhibit I**)

105.     These unequivicle statements by both the Defendant and the Plaintiff show that Ms. Taphorn did not resign and the Defendant did in fact terminate Ms. Taphorn.

106.     Where the Defendant so dishonestly manipulated such a black and white aspect of the overall Covid-19 exemption process, the question must be asked: "What else did the Defendant manipulate in such a way as to be fraudulent?"

107.     Defendant used the desire "to achieve Zero patient and team member harm," as further justification to terminate Ms. Taphorn. However, there are zero studies to show vaccination can lead to such a goal. This is just another attempt by the Defendant to manipulate the situation to try to make an illegal process appear legal.

108.     The ridiculousness of a "Zero harm" policy will be easily proved when discovery is available. It will be plain for all to see that dozens and dozens of vaccinated TriHealth employees caught Covid-19 near the time of Ms. Taphorn' termination and that it continues up to today. Per information and belief, every level of TriHealth employees, from management to surgeons, to nurses, and sanitation continue to test positive for Covid-19 virtually every day.

109.     Upon information and belief, the Defendant never planned to follow federal or state law requirements, discussed *infra*, that reasonable accommodations must be made for the religious observances of its employees, short of undue hardship.

110.     Upon information and belief, the Defendant did not consider any request for religious accommodations where an employee failed to meet the September 17, 2021 cut-off date.

111.     Plaintiff objects to receiving the Covid-19 vaccine because she is a Christian, her body is the temple of the Holy Spirit and, as a Christian, she is compelled to protect her body

25

from defilement especially where the countermeasure used aborted fetal cells in any portion of manufacturing, testing, and/or development.

B. Federal law and State law prohibiting religious discrimination.

112.    Title VII prohibits the Defendant from discriminating against employees based on their religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

113.    Title VII "imposes upon employers a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of undue hardship." *Reed v. International Union, United Automobile, Aerospace and Agricultural Implement w\Workers of America*, 569 F.3d 576, 579 (6th Cir. 2009).

114.    A prima facie case of religious discrimination based on a failure to accommodate requires a plaintiff to show "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [defendant's] attention, and (3) the religious practice was the basis for the adverse employment decision." *E.E.O.C. v. Union Independiente de la Autoridad de Acuductos y Alcantarillados de Puerto Rica*, 279 F.3d 49, 55 (1st Cir. 2002). *See also Reed,* 569 F. 3d at 579 (6th Cir. 2009); *Smith v. Pyro Mining Co.,* 827 F.2d 1081 (6th Cir. 1987) A "bona fide religious practice" or belief is one that is "religious and sincerely held." *Id.* Title VII's definition of religion includes "all aspects of religious observance and practice, as well as belief." *Id.,* citing 42 U.S.C. § 2000e(j). Further 29 C.F.R. § 1605.1 states that religious practices include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious values." Section 2000e(j) "leaves little

26

room for a party to challenge the religious nature of an employee's professed beliefs." *Union Independiente*. Religious beliefs are not required to be "acceptable, logical, consistent, or comprehensible to others," and that interfaith differences as to what is scripturally acceptable are "not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.*

115.    Once an employee has made out a prima facie case of discrimination, the employer must show that it offered a reasonable accommodation, or that reasonable accommodation would be an undue burden. *Stanley v. Lawson Co.,* 993 F. Supp. 1084 (N.D. Ohio 1997).

116.    Ms. Taphorn carried each of these elements as outlined throughout this complaint. Specifically:

    a.  Her religious practice of not putting anything into her body that in part came from aborted fetal cells conflicted with Defendant vaccine policy,

    b.  Ms. Taphorn put Defendant on notice; and

    c.  The Defedant's failure to consider her religious practices, and how they conflict with the Defendant's policies, resulted in Ms. Taphorn' termination.

117.    Ms. Taphorn was under no duty to provide her religious exemption request while she was not working and during the informal beginning of her maternity leave. The law states that once the prima facie case above was met, the duty shifts to the Defendant to show they did what was required of them.

118.    Defendant made it clear they did nothing to carry their burden as documented throughout that the Defendant was required to provide an accommodation unless they can show it would be an undue burden.

119.     The burden-shift the Defendant failed to even provide lip service to is well defined and has been consistently applied for generations.  "An employer must . . . present evidence of undue hardship" and not "rely merely on speculation," *Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987). In this case the Defendant never provided any proof, nor stated to Ms. Taphorn that her accommodation request could prove an undue hardship.

120.     Merely stating that there is a completely unattainable goal of "Zero harm" for patients and co-workers without providing evidentiary support cannot be sufficient to meet the Defendant's obligation under Title VII to establish undue hardship. Establishing "undue hardship" requires assessment of actual circumstances at the employer's place of business and of proposed and potential accommodations. The Defendant's rote denial demonstrates that the Defendant did not do the work of assessing undue hardship. *See* **Exhibit H**.

121.     Undue hardship analysis must start with an analysis of proposed accommodations. The Defendant did not identify potential accommodations. Therefore, the Defendant did not reach the first step of analyzing accommodations. An employer violates Title VII if it fails to attempt as accommodation after accommodation is requested. *EEOC v. Arlington Transit Mix, Inc.,* 957 F.2d 219, 222 (6th Cir. 1991) ("[a]fter failing to pursue [a voluntary waiver of seniority rights] or any other reasonable accommodation, the company is in no position to argue that is was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship."); *EEOC v. Ithaca Indus., Inc.,* 849 F.2d 116 (4th Cir. 1988) *cert denied* 488 U.S. 924 (1988) (same).

122.     An employer must demonstrate attempted accommodation before it claims undue hardship as a defense. *See, e.g., Redmond v. GAF Corp.,* 574 F.2d 897, 901-02 (7th Cir. 1978); *Shaffeld v. Northrop Worldwide Aircraft Serv., Inc.,* 373 F. Supp. 937, 944 (M.D.

Ala. 1974). The Defendant's' justification for denying the Plaintiff's requests for religious exemptions demonstrates that it did not consider potential accommodations.

123.     Moreover, the Defendant clearly could have considered accommodations as dictated by the EEOC. In the EEOC Covid-19 guidelines, they provide "examples of reasonable accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to disability; religious beliefs, practices, or observance; or pregnancy." Reasonable accommodations the EEOC has identified as potentially not imposing an undue hardship on the employer include requiring the unvaccinated employee entering the workplace to:

(1) wear a face mask,

(2) work at a social distance,

(3) work a modified shift.

(4) get periodic tests for COVID-19,

(5) be given the opportunity to telework, or

(6) accept a reassignment.

*See* EEOC Covid-19 Guidance*,* K.2.

124.     The Plaintiff would have willingly complied with any of these accommodations.

125.     Beginning in March 2020, the Defendant had the opportunity to test many relevant accommodations for its employees, including daily assessments of personal health and potential exposure, availability of targeted Covid-19 testing, protocols requiring non-work when symptomatic or potentially exposed to Covid-19, contact tracing, handwashing and hygiene, and the use of PPE.

126. Such accommodations are understood to have prevented any substantial or material transmission of Covid-19 when consistently used.

127. In addition, other accommodations are potentially available. For instance, the EEOC has specifically identified testing of employees before they enter the workplace. The EEOC COVID-19 Guidance states, "an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace and/or periodically to determine if their presence in the workplace poses a direct threat to others." *EEOC COVID-19 Guidance*, A.6.

128. The Defendant's decision denied any opportunity to evaluate whether Ms. Taphorn's beliefs were religious in nature and/or sincerely held. However, a fair reading of her exemption request easily meets the sincerely held religious beliefs under the federal law as defined by the EEOC, case law and Ohio law. *See* **Exhibit D.**

129. The Defendant made no attempt to accommodate the Plaintiff's request for religious exemption, even though she was willing to comply with other safety precautions.

130. The Defendant made no showing, nor ever even attempted to support, that providing the Plaintiff the requested exemption was an undue burden.

131. The Defendant did not engage the Plaintiff in a give and take discussion about potential accommodations. Plaintiff's willingness to comply with other safety measures were ignored.

132. It is well established that Title VII and O.R.C. § 4112 "have the same

evidentiary standards and general analysis." *Gibbons v. Bair Foundation,* No. 1:04CV2018, 2007 WL 582314, at *4-5 (N.D. Ohio Feb. 20, 2007) citing *Greene v. St. Elizabeth Hosp. Med. Ctr.,* 134 F.3d 371, 1998 WL 13410, at *5 (6th Cir. 1998).

133.    Given these facts, the Defendant's vaccination policy was vastly overreaching and unnecessarily violated federal and state law.

## COUNTS

### COUNT ONE

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
Religious Discrimination-Failure to Accommodate**

134.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

135.    At all times relevant, Plaintiff was Defendant's "employee" within the meaning of 42 U.S.C. § 2000e(f).

136.    At all times relevant, the Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b).

137.    Plaintiff holds sincere religious beliefs that preclude her from receiving a Covid-19 and flu vaccines.

138.    Plaintiff informed her employer, the Defendant, of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

139.    The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request. The Defendant failed to provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

140.    The Defendant thereby discriminated again the Plaintiff because of

31

her religious beliefs.

141.     By failing to engage in the interactive process or offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

142.     It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions who failed to meet the deadline date of September 17, 2021. However, Ms. Taphorn did meet the deadline date that was subsequently provided to her. The Defendant never intended to provide her with a reasonable accommodation.

143.     The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not carry the burden required to do so at the time of Ms. Taphorn's religious exemption request. And *arguendo*, the Plaintiff effectively rebuts any claim of undue burden above.

144.     By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemptions, the Defendant violated Title VII. And this violation has harmed and continues to harm Plaintiff.

145.     Due to the Defendant's improper, willful, intentional, and unlawful Actions, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

### COUNT TWO

### Violation of O.R.C. § 4112, *et seq.*,
### Religious Discrimination-Failure to Accommodate

146.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

147.    Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

148.    Plaintiff informed the Defendant of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

149.    The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request. The Defendant failed to provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

150.    The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

151.    By failing to engage in the interactive processor offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of O.R.C. § 4112, *et seq.*

152.    It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process concerning her specific religious exemption/accommodation request because the Defendant intended to discriminate against those seeking religious exemptions who failed to meet the Defendants arbitrary deadline date. Defendant never intended to provide her with a reasonable accommodation.

153.    The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

154.    By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemption, the Defendant violated O.R.C. § 4112, *et seq.* And this violation has harmed and continues to harm Plaintiff.

155.    Due to the Defendant's improper and willful, intentional, and unlawful actions, conducted with malice and aggregated and egregious fraud, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A. Payment for all economic damages, including, but not limited to, back pay, front pay and benefit in amounts to be determined at trial;

B. Compensatory and consequential damages, and all non-economic damages, including for emotional duress;

C. Punitive damages;

D. Statutory damages;

E. Pre-judgment and post-judgment interest at the highest lawful rate;

F. An award of reasonable attorneys' fees, costs and expenses of all litigation to the extent allowable under federal and state law;

G. Trial by jury on all triable issues; and

H. Such other relief as the Court deems just and proper.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/Glenn Feagan*_____
Glenn Feagan (Bar No. 041520)
Deters Law
5247 Madison Pike
Independence, KY 41051
Phone. (859) 363-1900
gfeagan@feaganlaw.com